_____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

_____

| | |
|---|---|
| VALERIE HOLGERS and MICHAEL SULLIVAN, for themselves and the heirs of ROSS MICHAEL SULLIVAN, deceased, <br><br> Plaintiff, <br><br> v. <br><br> SOUTH SALT LAKE, SOUTH SALT LAKE CITY POLICE DEPARTMENT, CHRIS SNYDER, RYAN CRAM, SGT. DANIELS, BRITTAN HEDDLESTON, SCOTT MCBRIDE, LOUIE MUNIZ and JASON RASMUSSEN, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> **AND** <br><br> **DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Civil No. 2:10-CV-532 DN <br><br> Judge David Nuffer |

## TABLE OF CONTENTS

CASE OVERVIEW ...................................................................................................2
ISSUES AND CLAIMS IN THIS CASE AND MOTIONS ........................................2
UNDISPUTED FACTS .............................................................................................3
I.  SUMMARY JUDGMENT STANDARD ..............................................................14
II.  QUALIFIED IMMUNITY ..................................................................................14
    A. Qualified Immunity Factors...........................................................................16
        1.  Severity of the Crime - Ross Sullivan was suspected of having committed a violent felony and other misdemeanors. ........................................................... 16
        2.  Potential Threat - Sullivan presented a danger to himself, others, and the officers. ........ 17
        3.  Noncompliance - Sullivan repeatedly refused to comply with the requests of officers. .. 18
    B  Specific Actions ...........................................................................................19
        1. Pointing of Firearms Was Reasonable .............................................................. 19
        2. Taser Use Was Reasonable ............................................................................ 19
        3. Entry into the Apartment Was Reasonable ...................................................... 21
        4. The Shooting Was Reasonable ....................................................................... 22
III.  CIVIL RIGHTS CLAIMS AGAINST THE MUNICIPALITY .............................23
IV.  PENDENT TORT CLAIMS................................................................................24
ORDER ..................................................................................................................25

## CASE OVERVIEW

This case arises from the shooting of Ross Michael Sullivan in his apartment on January 21, 2008. The death of Mr. Sullivan is a tragedy, shared by all parties to this case. This decision deals only with the legal balance of the rights of Mr. Sullivan and his family against the obligations of law enforcement. These considerations are abstract and impersonal when compared to the loss suffered by Mr. Sullivan's family, and by officers whose duties called them to the scene that day.

Valerie Holgers and Michael Sullivan, the heirs of Ross Michael Sullivan, brought this suit against the City of South Salt Lake, South Salt Lake Police Department, the chief of police for South Salt Lake Chris Snyder, and South Salt Lake City Police Officers Ryan Cram, Brittan Heddlesten, Scott McBride, Louie Muniz, and Jason Rasmussen, together with Sergeant Steve Daniels (hereinafter jointly the "Officers") who were all present at the scene at the time of the shooting. Defendants filed a motion for summary judgment as to all causes of action raised in the First Amended Complaint on grounds of qualified immunity and governmental immunity.[1] Plaintiffs filed a motion for partial summary judgment on the merits.[2]

## ISSUES AND CLAIMS IN THIS CASE AND MOTIONS

Defendants' motion raised the affirmative defense of qualified immunity as the basis for summary judgment as to the First, Second, Third, Fourth, Fifth, and Sixth causes of action. Defendants also raised governmental immunity under the Governmental Immunity Act of Utah as to the pendent tort claim for wrongful death and negligence against the City of South Salt Lake.

---

[1] Docket no. 65, filed April 9, 2013.

[2] Docket no. 69, filed May 16, 2013.

Plaintiffs' motion requested that the Court find as a matter of law that Defendants' use of a Taser constituted an unlawful use of force; that Defendants' entry into Ross Sullivan's apartment constituted a violation of Sullivan's Fourth Amendment right; that Defendants' use of a Taser violated internal department policies resulting in a police-created deadly force scenario; and that the City of South Salt Lake was liable for the conduct of its police officers.

## UNDISPUTED FACTS

These undisputed facts are largely taken from Defendants' Motion for Summary Judgment (Motion 65).[3] Some facts which were disputed by Plaintiffs have been modified to remove the disputed statements where Plaintiffs offered supporting citations for the dispute. Where Plaintiffs' disputes had no source citations, they have been disregarded.

Plaintiffs also offered a statement of facts, but many were unsourced, and could not be considered. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."[4] Plaintiffs also stated they were "filing a separate FRCP 56 (c)(2) motion"[5] but this was not done. Some facts asserted by Plaintiffs were not material to the issues on this motion. Many were not material to the officers' knowledge of events, which is primary under the legal standards.

The court sent a draft of the undisputed facts to counsel before the hearing[6] and reviewed them carefully with counsel at the hearing. Because issues were raised in the hearing by

---

[3] Docket no. 65, filed April 29, 2013.

[4] Fed. R. Civ. P. 56(c)(1).

[5] Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment (Opposition 68) at 1, docket no. 68, filed May 14, 2013.

[6] Email October 18, 2013, attaching Draft Statement of Undisputed Facts, docket no. 88, filed October 25, 2013.

Plaintiffs' counsel, the court permitted post hearing submissions[7] regarding the undisputed facts. An order was then entered resolving issues Plaintiffs raised.[8]

1.      At approximately 10:52 a.m. on Sunday, January 21, 2008 a neighbor called police dispatch to report that her neighbor Ross Sullivan had thrown some objects from his fourth floor balcony (a television set, a small Christmas tree, and some other items, and had turned his music up loud and was talking loudly and swearing. Officer Cram was the first to arrive on the scene after receiving a call of a possible mental subject. Shortly after that, Officer Rasmussen showed up as backup.[9] Dispatch reported that there was no report of threat of harm at that time.[10]

2.      Officer Cram arrived first and acted as the primary officer on the scene at the time.[11]

3.      When the officers arrived, they observed large items, such as a Christmas tree and a television lying on the ground underneath the apartment balcony.[12]

4.      As the officers approached the building, they heard loud, "screamer" music coming from the Sullivan apartment.[13]

---

[7] Plaintiff's Memorandum Permitted by Court re: Document 85, docket no. 86, filed October 22, 2013; Response and Objection to Plaintiff's Memorandum Permitted by Court Re: Document 85, docket no. 87, filed October 23, 2013.

[8] Order Following Summary Judgment Hearing, docket no. 89, filed October 25, 2013.

[9] Ex. 3 to Opposition 68, Rasmussen TR pg 13, L. 2-21.

[10] Ex. 3 to Opposition 68, Rasmussen TR page 14, L. 19-24; Cram Depo. at 4:22-5-13, attached to Motion 65 as Exhibit A; Rasmussen Depo. at 12:13-13:9, attached to Motion 65 as Exhibit B.

[11] Rasmussen Depo. at 12:13-13:9, attached to Motion 65 as Exhibit B.

[12] Cram Statement at 3, attached to Motion 65 as Exhibit C.

[13] Rasmussen Depo. at 15:12-20, attached to Motion 65 as Exhibit B.

5. They attempted to communicate with the person inside the apartment, and he turned down the music and told them "No, no I called my doctor and I'm getting it taken care of."[14]

6. The front door of the apartment faced a landing or balcony about four feet wide, with a stairway on the north end.[15]

7. Cram then responded, "Well come to the door. We can get a hold of your doctor. We just want to make sure everything's ok. Um, we were called here to check on you. We just want to make sure you're ok."[16]

8. Sullivan refused to come out, but told them through the door that he was having girlfriend problems and was having a hard time. Sullivan's voice got louder and louder as the exchange continued.[17]

9. Sullivan then refused to open the door and turned the music back up.[18]

10. Some of the neighbors commented that he had been yelling and that the music had been loud all morning.[19]

11. The officers tried to communicate through the door with him again. He told them to leave him alone, that he was not coming out, that he would clean up the mess, and that he would turn down the music.[20]

---

[14] Cram Statement at 3:22-23, attached to Motion 65 as Exhibit C.

[15] Heddlesten Depo. 51:3-53:3, attached to Motion 65 as Exhibit D; Exhibit 4 to Heddlesten Depo., attached to Motion 65 as Exhibit E.

[16] Cram Statement at 3-4, attached to Motion 65 as Exhibit C.

[17] Id. at 4.

[18] Id. at 4.

[19] Id. at 4.

[20] Id. at 4; Muniz Depo. at 15: 4-13, attached to Motion 65 as Exhibit F.

12.     When the officers again told him that he needed to speak with them face to face, he refused and turned the music back up.[21]

13.     This process occurred repeatedly, always ending with the music being turned up again and with swearing and yelling from inside the apartment.[22]

14.     At some point during these exchanges, Sullivan began pounding or hitting the door with something from the inside.[23]

15.     At some point, Officers Heddlesten and Muniz arrived as backup.[24]

16.     Cram advised Sgt. Daniels of the situation, and Sgt. Daniels proceeded to the scene.[25]

17.     Around the same time, Officer McBride arrived on the scene and was directed to watch the back of the building. McBride took up a position on the back side of the apartment on the ground.[26]

18.     Officer Cram attempted again to get Sullivan to come out, and Sullivan turned down the music to talk through the door. Sullivan told the officers that they needed to leave or it was "going to get ugly real quick."[27]

19.     After Sgt. Daniels arrived, Cram and Daniels spoke with a maintenance man who had been shoveling snow off the sidewalk. The male told them that he had been shoveling the

---

[21] Cram Statement at 4, attached to Motion 65 as Exhibit C.

[22] Heddlesten Depo. at 27:12-28:9, attached to Motion 65 as Exhibit D.

[23] Cram Statement at 5, attached to Motion 65 as Exhibit C.

[24] Heddlesten Depo. at 18:11-19:7, attached to Motion 65 as Exhibit D; Muniz Depo. at 13:13-25, attached to Motion 65 as Exhibit F.

[25] Cram Statement at 5, attached to Motion 65 as Exhibit C.

[26] *Id.* at 5-6.

[27] *Id.* at 6:3-9.

walks earlier and that Sullivan had come out with a sheathed sword and yelled, "Are you going to keep us up all morning? Can't you be quiet?" The male told them that Sullivan had not made any verbal threats, but had waved the sword around in a way that the male interpreted as a threat. The male said, "He didn't ever threaten me with it verbally, but I got the impression that you need to stop or else."[28]

20.     The male told them that he felt threatened. [29]

21.     During phone conversations between Daniels and Sullivan, officers Cram, Rasmussen, Heddlesten and Muniz were on the landing outside the apartment. For some of that time, Muniz was on the staircase directly across the landing from the doorway with his Taser drawn and pointed at the doorway.[30]

22.     There were two windows in the apartment facing directly toward the landing: one in the living room next to the front door and one in the kitchen to the south of the door. The officers were able to see Sullivan occasionally through the living room window and they observed him peeking out at them on occasion[31].

23.     At some point, Sullivan called his girlfriend Michelle Moshea and asked her to come to scene.[32]

24.     Moshea said he seemed agitated at that time.[33]

---

[28] *Id.* at 7; Daniels Depo. at 29:22-30:8, attached to Motion 65 as Exhibit G.

[29] Cram Statement at 7, attached to Motion 65 as Exhibit C.

[30] *Id.* at 8.

[31] *Id.* at 8.

[32] Daniels Depo. at 34:25-35:3, attached to Motion 65 as Exhibit G; Moshea Depo. at 15:22-16:9, attached to Motion 65 as Exhibit H.

[33] Moshea Depo.at 16:10-13, attached as Exhibit H.

25.     When Moshea arrived, she told the police that Sullivan was a sushi chef and that he had knives. Moshea testified in her deposition that she told the police that Sullivan did not have any guns, to her knowledge.[34]

26.     Sgt. Daniels reported that Sullivan told him there were guns in the apartment.[35]

27.     Moshea also told the police that Ross hadn't been acting like himself, and that the night before, they had discussed that she felt he needed to be mentally evaluated.[36]

28.     Moshea said Sullivan asked the officers to let her go in and talk to him, but the officers refused, telling Moshea that they did not think it would be safe.[37]

29.     Moshea told the officers that she did not think Sullivan would hurt anyone.[38]

30.     At some point, Sullivan hung up the phone while talking to Moshea. He then turned up the music loud and started yelling. At that point, the officers instructed the landlord to shut off the power.[39]

31.     At some point, Sullivan stabbed a metal blade several inches through the wood door.[40]

32.     Some of the officers interpreted the act as a threat to the officers.[41]

33.     During telephone conversations with Daniels and Moshea, Sullivan would calm down and even start joking with them on the phone.[42]

---

[34] *Id.* at 32:2-18.

[35] Daniels Depo. at 35:7-24, attached to Motion 65 as Exhibit G.

[36] Moshea Depo. at 24:11-24, attached to Motion 65 as Exhibit H.

[37] *Id.* at 25:2-5.

[38] *Id.* at 70:1-4.

[39] *Id.* at 28:5-9.

[40] Heddlesten Depo. at 28:17-29:5, attached to Motion 65 as Exhibit D.

[41] Heddlesten Depo. at 33:5-9, attached to Motion 65 as Exhibit D.

34.     Michelle Moshea said that Ross Sullivan was joking with Sgt. Daniels about getting a limo ride to go skiing at Solitude; and that he wanted to make sure he was not going to be arrested. She reported that Sgt. Daniels had told her they would use the Taser on Ross and take him into custody for a mental evaluation. [43]

35.     Officers acknowledged that it was very cold, that the snow was blowing on them, and that they had been standing outside the apartment waiting for Ross Sullivan to come out for somewhere between 60 to 90 minutes.[44]

36.     Sullivan agreed to come out on two occasions, and on both occasions, opened the door to some degree before retreating into the apartment and slamming the door. One time, when Ross Sullivan followed a police directive to come out of his apartment, he stepped completely outside. Officer Cram stated "I don't recall where his hands were. . . second or third [time], I don't know.[45]   After each of these instances, he turned the music back up and started yelling again.[46]

37.     On the second occasion when Sullivan came out of the apartment, he exited briefly, but ignored the commands of the officers to kneel or lie down.[47]

38.     At some point, Sullivan peaked through the window and told them he wouldn't come out, and to put the Taser away.[48]

---

[42] E.g., Daniels Depo.61:10-62:9; 63:14-63:20, attached to Motion 65 as Exhibit G.

[43] Ex. 4 to Opposition 68, Moshea Witness Statement dated 1/24/08.

[44] Exhibit 15 to Opposition 68 excerpt from transcript of interview of Officer Heddleston by Dirk Watrous of the D.A.'s office; and Exhibit 3 to Opposition 68, excerpt from transcript of Officer Rasmussen, pg, 23, line 5-12, and Exhibit 16 to Opposition 68 excerpt from transcript of interview of Louie Muniz, page 12, line 22-23.

[45] Ex. 7 to Opposition 68, Cram TR 60.

[46] Cram Statement at 10:18-21; 11:2-[23], attached to Motion 65 as Exhibit C.

[47] Cram Depo. at 61:5-11, attached to Motion 65 as Exhibit A.

[48] Cram Statement at 10:13-16, attached to Motion 65 as Exhibit C.

39.     Sgt. Daniels did not recall whether he asked Ross Sullivan if he threatened the maintenance man with a sword; and at no time did Sgt. Daniels tell Ross Sullivan he was under arrest.[49]

40.     Sgt. Daniels told Sullivan that they had guns and could not put them away. But he told Sullivan they would keep the guns and Taser pointed at the ground while he came out.[50]

41.     The officers got an apartment key from the manager and attempted to unlock the front door to gain entry into the apartment, but the lock had apparently been changed and the key did not work. While the officers tried to unlock the door, Sullivan screamed and banged on the other side of the door.[51]

42.     At this point, the officers decided that if Sullivan came out, they were going to attempt to Taser him and take him into custody.[52]

43.     Muniz was set to deploy the Taser, Cram and Heddlesten were hands free (weapons holstered) and were going to go hands on with Sullivan after the Taser deployment. Officer Rasmussen was ready with his side arm at the low-ready position (pointed down).[53]

44.     Sullivan again agreed to come out the apartment. He opened the door partway again, and Muniz deployed the Taser. Cram saw that one of the Taser prongs connected with Sullivan.[54]

---

[49] Ex. 6 attached to Opposition 68, Daniels TR p. 36, L. 1-7.

[50] *Id.* at 10:17-25; Moshea depo. at 34:4-13, attached to Motion 65 as Exhibit H.

[51] Cram Statement at 11:13-25, attached to Motion 65 as Exhibit C.

[52] *Id.* at 12:7-9.

[53] *Id.* at 12:9-15; exhibit 7 to Cram Depo., attached to Motion 65 as Exhibit I.

[54] Cram Statement at 12:17-20, attached to Motion 65 as Exhibit C.

45. When Muniz deployed the Taser, Sullivan's torso, left arm and head were through the doorway. He could not see Sullivan's right hand.[55]

46. Heddlesten, Cram, and Rasmussen immediately began moving toward the door when the Taser deployed. Sullivan retreated into the apartment at the same time.[56]

47. The Officers did not know if both prongs of the Taser had connected or what Sullivan's condition from the tasing was.[57]

48. Within one or two seconds of the door closing, Heddlesten kicked in the door and entered the apartment first. Cram was immediately behind him and Rasmussen entered just to the right of Heddlesten.[58]

49. Sullivan was standing just a few feet inside the doorway and his back was turned, with his shoulders and head stooped like he was picking something up.[59]

50. Sullivan then turned and swung a sword at Officer Heddlesten.[60]

51. Heddlesten then retreated out the door past Officers Cram and Rasmussen.[61]

52. At this point, Cram and Rasmussen were just a few feet from Sullivan.[62]

53. Sullivan, sword still in hand, advanced toward Cram and Rasmussen, and Rasmussen raised his gun and shot Sullivan.[63]

---

[55] Muniz Depo. at 33:20-22, attached to Motion 65 as Exhibit F.

[56] Cram Depo. at 67:10-12, attached to Motion 65 as Exhibit A.

[57] Muniz Depo. at 40:10-13, attached to Motion 65 as Exhibit F; Heddlesten Depo. at 50:3-7, attached to Motion 65 as Exhibit D.

[58] Cram Depo. 75:10-18, 79:7-13, attached to Motion 65 as Exhibit A.

[59] Id. at 80:3-13.

[60] Id. at 80:15-25.

[61] Id. at 81:10-17.

[62] Id. at 84:15-85:3.

[63] Id. at 83:17-24.

54. Cram testified that Heddlesten's retreating and the gun shots happened almost simultaneously.[64]

55. There is some dispute as to whether Rasmussen was in the apartment or doorway at the time of the shooting. Cram placed Rasmussen standing in the doorway, to the right side.[65] Rasmussen testified that he was just inside the doorway to the right.[66]

56. The officers never told Sullivan he was under arrest.[67]

57. Daniels testified that Moshea told him she wanted Sullivan taken to the hospital to be looked at for mental issues.[68]

58. Daniels decided it was necessary to take Sullivan into custody because of his threat to the maintenance man, the mood swings, and because he presented a danger of harm to himself or to the public.[69]

59. The procedure of taking a mentally disturbed person into custody for medical evaluation is referred to as "pink sheeting."[70]

60. The officers planned to pink sheet Sullivan, not to arrest him for any crime.[71]

61. Daniels told him they wanted him to come out because they were worried about him. Daniels promised Sullivan that if he came out they would not arrest him.[72]

---

[64] *Id.* at 87:17-19.

[65] *Id.* at 84:14-18.

[66] Rasmussen Depo.. 38:16-21, attached to Motion 65 as Exhibit B.

[67] Daniels Depo. 36:6-7, attached to Motion 65 as Exhibit G.

[68] *Id.* at 36:12-19.

[69] *Id.* at 41:4-42:17; 55:9-10.

[70] *Id.* at 44:1-8.

[71] *Id.* at 47:11-13.

[72] *Id.* at 60:1-7.

62.     Michelle Moshea was with Sullivan during the night prior to the shooting. She testified that he was unusually emotional and depressed, and that he cried a lot. She also testified that his apartment, which was normally neat and clean, was dirty. These were behaviors she had never seen Sullivan exhibit before.[73]

---

[73] Moshea depo. 15:5-13, attached to Motion 65 as Exhibit H.

# I.  SUMMARY JUDGMENT STANDARD

"A motion for summary judgment should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[74] "In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party."[75] A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record.[76]

# II.  QUALIFIED IMMUNITY

Plaintiffs have raised claims of violations of civil rights under Section 1983 of Title 42 of the United States Code. To establish a claim under Section 1983, a plaintiff must show that "(1) defendants acted under color of state law to deprive [the plaintiff] of a right, and (2) the right of which defendants deprived [the plaintiff] was secured by the Constitution or the Laws of the United States."[77]

In response to Plaintiffs' allegations, Defendants raised the affirmative defense of qualified immunity. "When a defendant raises the defense of qualified immunity, the burden is on the plaintiff to demonstrate (1) that the defendant's actions violated a specific constitutional right, and (2) that the right at issue was clearly established at the time of defendant's alleged misconduct."[78]

---

[74] *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312-13 (10th Cir. 2009).

[75] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[76] Fed. R. Civ. P. 56(c)(1).

[77] *Anglin v. City of Aspen, Colo.*, 552 F.Supp.2d 1205, 1215 (D.Colo. 2008).

[78] *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010).

## A.  STANDARD FOR ANANALYSIS OF EXCESSIVE FORCE CLAIMS

"We analyze claims of excessive force under the objective reasonableness standard of the Fourth Amendment."[79] "In determining the reasonableness of the manner in which a seizure is effected, we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."[80] "The reasonableness of an officer's conduct must be assessed from the perspective of a reasonable officer on the scene, recognizing the fact that the officer may be forced to make split-second judgments under stressful and dangerous conditions."[81] "The Fourth Amendment standard requires inquiry into the factual circumstances of every case; relevant factors include the crime's severity, the potential threat posed by the suspect to the officer's and others' safety, and the suspect's attempts to resist or evade arrest."[82] This is not a precise formula to apply, but these are relevant factors to consider.[83]

Three and possibly four actions of the officers were alleged to be violations of Ross Sullivan's rights. Those clearly plead in the complaint and raised in the briefing were deployment of the Taser, entry into the apartment, and the shooting. The Taser and shooting were alleged to be excessive force and the entry into the apartment was alleged to be a violation of Sullivan's Fourth Amendment right to be secure in his home. At the hearing, Plaintiff's counsel argued that pointing firearms at Mr. Sullivan was also a use of unreasonable force. This order will discuss all four actions.

---

[79] *Mecham v. Frazier*, 500 F.3d 1200, 1204 (10th Cir. 2007).

[80] *Id.*

[81] *Gross v. Pirtle*, 245 F.3d 1151, 1158 (10th Cir. 2001).

[82] *Id.*

[83] *Phillips v. James*, 422 F.3d 1075, 1081 (10th Cir. 2005).

As explained below, the officers' use of force in deploying the Taser, in pointing their weapons at Sullivan, in using deadly force, and in entering his apartment was objectively reasonable. Further, the law governing use of a Taser under these circumstances was not clearly established at the time. For those reasons, Plaintiffs' claims are barred by qualified immunity and the claims alleging civil rights violations will be dismissed.

## A. Qualified Immunity Factors

In evaluating all these alleged violations, the context must be taken into account. As stated above, the use of force in each instance must be evaluated in light of the crime's severity, the potential threat posed by Sullivan to the officer's and others' safety, and Sullivan's noncompliance with officers' directions.

### 1. Severity of the Crime - Ross Sullivan was suspected of having committed a violent felony and other misdemeanors.

Ross Sullivan was suspected of having committed several criminal acts. First, the officers had a report that he had made a threat of violence against the groundskeeper. This would be a class B misdemeanor.[84] The actions, as relayed to the officers, could also have potentially constituted aggravated assault, a third degree felony, since Sullivan allegedly used a sword in making the implied threat.[85] Sullivan also stabbed a knife blade through the apartment door while disregarding the officers' directions. There was therefore a reasonable suspicion that Sullivan had committed criminal mischief which could range from a third degree felony to a class B misdemeanor.[86] When Sullivan stabbed the blade through the door, this presented facts

---

[84] Utah Code Ann. § 76-5-107.3.

[85] Utah Code Ann. § 76-5-103.

[86] Utah Code Ann. § 76-5-106.

consistent with an assault against a peace officer in uniform, a class A misdemeanor.[87] Also, the officers had evidence to suggest Sullivan had committed disorderly conduct, a class C misdemeanor.[88]

## 2. Potential Threat - Sullivan presented a danger to himself, others, and the officers.

The officers were justifiably concerned for the welfare of Sullivan, his neighbors, the public at large, and the officers on the scene. The information available to the officers was that Sullivan was ordinarily quiet and peaceful, but that he had been seen yelling and throwing large objects off his fourth floor balcony. He also had "screamer" music turned up loud enough to hear from some distance from his apartment. The officers were told that Sullivan had threatened the groundskeeper who was clearing snow from the walks. During the interactions with Sullivan, he alternated between calm and joking and angry, erratic behavior. The officers believed Sullivan had knives and a sword in the apartment. (While Sgt. Daniels testified that Sullivan told him that he had guns in the apartment, this fact has been disregarded in this decision. The other facts are sufficient for the decision's result. This fact was not disputed by presentation of contradictory evidence, but plaintiff's counsel disputed the trustworthiness of this statement.) Sullivan's girlfriend, Michelle Moshea, also told the officers that she believed Sullivan needed to be taken to a hospital for medical treatment. Finally, Sullivan stabbed a knife blade through the front door near the officers.

It was clear that Sullivan presented a danger to himself or others. The officers could not simply leave him in his apartment to later come out and threaten or harm others. Furthermore,

---

[87] Utah Code Ann. § 76-5-102.4.

[88] Utah Code Ann. § 76-9-102.

the officers were waiting outside the apartment on a fourth floor landing that was just four feet wide. The physical setting presented a scenario where they had some difficulty in maintaining a safe perimeter and the heights presented additional dangerous circumstances to the officers.

### 3. Noncompliance - Sullivan repeatedly refused to comply with the requests of officers.

The officers gave Sullivan repeated commands and made repeated requests, with which he failed to comply. This confrontation lasted for a significant time. Furthermore, the officers had statutory grounds to take Sullivan into protective custody. Under Utah law, if a

> peace officer observes a person involved in conduct that gives the officer probable cause to believe that the person has a mental illness, . . . and because of that apparent mental illness and conduct, there is a substantial likelihood of serious harm to that person or others, . . . the officer may take that person into protective custody.[89]

After observing and communicating with Sullivan, the officers believed that Sullivan required mental evaluation and that he presented a substantial likelihood of serious harm to himself or others. This was an objectively reasonable conclusion. Therefore, they determined that they needed to "pink sheet" him. He was displaying erratic mood swings, had allegedly threatened another person with a sword, and had thrown large objects from his balcony.

The officers repeatedly told him that they wanted him to come out so they could talk to him to make sure he was okay. Sullivan repeatedly refused to come out, and on the occasions when he agreed to come out, he opened the door, emerged part way, and then retreated into the apartment. He had displayed a sword and stabbed a knife through his door toward the officers.

---

[89] Utah Code Ann. § 62A-15-629.

**B  Specific Actions**

**1. Pointing of Firearms Was Reasonable**

The officers' pointing of their firearms at Sullivan prior to deployment of the Taser was justified. This issue was not briefed by either party, but was first raised by Plaintiffs during the hearing on the motions. Plaintiffs have cited to no legal precedent to support their argument that pointing a firearm can constitute a violation of a constitutional right. Given the facts presented to the officers and discussed above, the pointing of firearms at Sullivan was objectively reasonable.

**2. Taser Use Was Reasonable**

The use of a Taser against Ross Sullivan was objectively reasonable. Viewing the facts from the perspective of a reasonable officer on the scene, Sullivan was suspected of having committed felonies and several other misdemeanors. Sullivan also presented a risk of harm to the officers, to himself, and without intervention of police, to the public. Finally, he repeatedly refused to comply with the requests and commands of the officers.

Two contrasting cases illustrate the permissible and impermissible use of Tasers at the time of this incident. In C*asey v. City of Federal Heights*[90] the Tenth Circuit held that use of a Taser on an individual who was leaving the courthouse with a file, without permission, was an excessive use of force. The Taser was deployed by a second officer arriving at the scene, seeing an argument between the individual and another officer, and no verbal command was given (or disobeyed) before deployment. The *Casey* opinion contrasts *Hinton v. City of Elwood* which the

---

[90] 509 F.3d 1278 (10th Cir. 2007).

Tenth Circuit decided more than a decade earlier in which an individual was subjected to an electric stun gun when actively resisting an officer's commands.[91]

      *Casey* also relied on and constrasted an 11th Circuit case which

> held it reasonable to fire a Taser at a truck driver who refused to provide his insurance information or a bill of lading and was yelling loudly at a police officer who pulled him over. The officer had not advised Mr. Draper that he was under arrest. However, the court found an electric shock from the Taser "reasonably proportionate" to the situation because Mr. Draper was belligerent and hostile, and because he had refused five commands to retrieve his documents from the cab of his truck.[92]

      *Casey* also noted the Tenth Circuit's prior decision in *Mecham v. Frazier*[93] which held that the use of pepper spray after repeated warnings was not excessive force when needed to obtain compliance. In that case, Mecham had ignored the officers' warningsand refused to leave her car which was on a narrow shoulder of a busy interstate highway where she might have been a danger to herself or others.[94]

      This case is much more similar to *Draper, Mecham* and *Hinton* than *Casey*. Sullivan was belligerent and non-compliant for a substantial period of time by refusing to exit the apartment or engage in conversation for any period of time, had interacted badly with the maintenance man while displaying a sword, was engaged in unusual behavior in yelling, swearing, playing music loudly in direct response to officers' contact, hung up on his girlfriend, and banged on his own door and then thrust a knife through the door.

---

[91] 997 F.2d 774, 777 (10th Cir.1993).

[92] *Draper v. Reynolds,* 369 F.3d 1270, 1278 (11th Cir.2004).

[93] 500 F.3d 1200 (10th Cir.2007).

[94] *Id.* at 1204-05.

*Casey*, by contrast, had at most engaged in behavior constituting a class one misdemeanor and had not exhibited any violent or bizarre behavior.[95] "Nor did [the officer discharging the Taser] have any reason to believe that Mr. Casey posed "an immediate threat to the safety" of anybody present."[96] The severity of the potential crimes, the potentially dangerous nature of the confrontation, and the prolonged period of non-compliance and erratic behavior show it was objectively reasonable for the officers to use the Taser to attempt to take Sullivan into custody for evaluation.

Plaintiffs have argued that the written procedures of the department prohibited use of the Taser under these circumstances and that this means there was a violation of rights and that the right was clearly established. However, municipal procedures are not relevant to a qualified immunity inquiry, as the real issue is whether a constitutional right is violated.[97] Municipal policies do not set constitutional standards.

Qualified immunity protects officers when the right at issue was not clearly established at the time of defendant's alleged misconduct.[98] If the *Draper, Casey* and *Mecham* cases relied on in the analysis of the use of the Taser do not support the preceding conclusion that the use of the Taser did not constitute excessive force, then the law regarding use of a Taser under these circumstances was not clearly established at the time of this incident.

### 3. Entry into the Apartment Was Reasonable

After the Taser was deployed, Sullivan retreated into his apartment. The officers pursued and kicked in Sullivan's door within 1 to 2 seconds after the Taser deployment. They entered

---

[95] 500 F. 3d at 1281.

[96] *Id.* at 1282.

[97] *Giannetti v. City of Stillwater*, 216 F. App'x 756, 766 (10th Cir. 2007) (unpublished)

[98] *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010).

about one to three feet into the apartment before being confronted by Sullivan. Under the facts of this case, the pursuit and entry into the apartment was reasonable and was not a violation of Sullivan's Fourth Amendment rights.

First, police in hot pursuit are not required to obtain a warrant. Where police are in hot pursuit of a suspect and the suspect retreats into a private residence, the officers may enter the residence, even if the confrontation prior to the retreat occurred in the doorway to the residence.[99]

Second, the officers knew the Taser had been deployed and at least one prong struck Sullivan. Sullivan retreated and closed the door before the officers could restrain him. At that point, his physical health and well-being were uncertain, and it was reasonable for the police to enter the apartment to protect Sullivan's safety. Furthermore, the reasonable use of the Taser, whether successfully deployed or not, presented danger of escalation, requiring the officers to finish taking Sullivan into custody to protect themselves and others from immediate harm. Police officers may also enter a home without a warrant where "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable."[100] The limited entry was reasonable.

### 4. The Shooting Was Reasonable

Even though tragic, Officer Rasmussen's use of deadly force was also justified and objectively reasonable. Deadly force is justified if a reasonable officer in Defendants' position "would have had probable cause to believe that there was a threat of serious physical harm to

---

[99] *United States v. Santana*, 427 U.S. 38, 43 (1976).

[100] *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006).

themselves or to others."[101] When the officers entered Sullivan's apartment, Sullivan swung a sword at Heddlesten. This is very comparable to the facts in Jiron v. City of Lakewood where the officer killed a person with a knife advancing toward him.[102] Although Sullivan's sword was ultimately determined to be decorative, it is undisputed that the officers had no way of knowing that at the time. Viewed from the perspective of the reasonable officer at the scene, the sword must be treated as real and potentially deadly. Sullivan was just a few feet inside the door, as were the officers. Heddlesten retreated backward, leaving officers Cram and Rasmussen within a few feet of Sullivan. Sullivan advanced toward the officers with the sword still in his hand and Officer Rasmussen shot Sullivan. The shots occurred almost simultaneous with Heddlesten retreating.

There is some dispute as to whether Rasmussen was inside the apartment, in the doorway, or just outside the doorway on the landing at the time of the shooting. This dispute as to the officers' precise location is immaterial to this decision, as the undisputed facts show the officers were in close proximity and that Sullivan was advancing toward them with the sword.

### III. CIVIL RIGHTS CLAIMS AGAINST THE MUNICIPALITY

Because the use of force by the officers was reasonable and justified, the municipality is also entitled to judgment as a matter of law in its favor. Section 1983 actions against the city, the police department, and the chief of police all are evaluated as though the action is against the

---

[101] *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004).

[102] *Id.* at 412.

municipality.[103] "A municipality cannot be liable under § 1983 if the officer in fact inflicted no constitutional harm."[104]  Therefore, the Second and Third Causes of Action are barred.

## IV.  PENDENT TORT CLAIMS

In the First Amended Complaint, the Seventh Cause of Action is asserted against the City of South Salt Lake for wrongful death and negligence arising out of the contact between the officers and Mr. Sullivan. Plaintiffs raised no tort claims against the officers or any governmental employee.

"[T]o determine whether a governmental entity is immune from suit under the Act, we apply a three-part test, which assesses (1) whether the activity undertaken is a governmental function; (2) whether governmental immunity was waived for the particular activity; and (3) whether there is an exception to that waiver."[105] Under the Governmental Immunity Act of Utah (GIAU), "[i]mmunity from suit of each governmental entity is waived as to any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment."[106] However, an exception to the waiver states that immunity is not waived "if the injury arises out of, in connection with, or results from. . . . assault, battery, abuse of process,  . . . or violation of civil rights . . . ."[107]  Because these claims arise out of alleged assault, battery, abuse of process, or violation of civil rights, the exception to the waiver of governmental immunity bars this claim for negligence and wrongful death against the municipality.

Therefore, summary judgment is appropriate as to the Seventh Cause of Action.

---

[103] *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).

[104] *Id.*

[105] *Glaittli v. State*, 294 P.3d 626, 628 (Utah Ct. App. 2013) (quoting *Blackner v. State Dep't of Transp.*, 48 P.3d 949, 951 (Utah 2002)).

[106] Utah Code Ann. § 63-30d-301(4) (2007).

[107] Utah Code Ann. § 63-30d-301(5)(b) (2007).

**ORDER**

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment[108] is

GRANTED as to all causes of action in the First Amended Complaint.

IT IS FURTHER ORDERED that Plaintiffs' motion for partial summary judgment[109] is

DENIED.

The clerk shall close the case.

Signed November 21, 2013.

BY THE COURT

District Judge David Nuffer

**Note:** This order was prepared in draft form by counsel for Defendants as instructed in the Order Following Summary Judgment Hearing, docket no. 89, filed October 25, 2013. No objection was received to the form of the order submitted but the court has made substantial modifications.

---

[108] Docket no. 65, filed April 9, 2013.

[109] Docket no. 69, filed May 15, 2013.